**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CT GARDENS, LLC, | ) | Case No. 25-11661 (LSS) |
| | ) | |
| _____ Alleged Debtor. ____) | | Re: D.I. 1 |

## ASSIGNEE'S MOTION TO ABSTAIN OR DISMISS AND FOR DAMAGES

Rinnovo Management LLC, in its capacity as Assignee for the Benefit of Creditors of CTG (the "**Assignee**") files this *Motion to Abstain or Dismiss and for Damages* (the "**Motion**") in response to the *Involuntary Petition Against a Non-Individual* [D.I. 1] (the "**Involuntary Petition**") filed by Arett Sales Corporation ("**Arett**"), BFG Supply Co., LLC ("**BFG**"), and Bradley Caldwell, Inc. ("**Bradley Caldwell**" and, together with Arett and BFG, the "**Petitioning Creditors**") and states as follows:

### PRELIMINARY STATEMENT

1.      The Involuntary Petition[1] makes no practical sense.  The Alleged Debtor liquidated its assets beginning in May 2025 after a failed marketing process.  The Alleged Debtor then entered into an *Assignment for the Benefit of Creditors* dated August 20, 2025 (the "**Assignment**") to ensure an orderly and fair distribution to creditors conducted by a neutral third-party fiduciary.  A copy of the Assignment is attached as **Exhibit A**.  On August 20, 2025, the Assignee commenced an ABC Proceeding in the Delaware Court of Chancery.   All of the foregoing necessitated significant work on the part of the Assignee and the Alleged Debtor and each of their counsel, including negotiation and drafting of the Assignment, preparation and filing of all necessary papers and ensuring possession and control of the Alleged Debtor's assets (the "**CTG Assignment Estate**").  Thereafter, the Assignee (i) inventoried the CTG Assignment Estate, (ii) filed its *Initial*

---

[1]      Capitalized terms not defined in this Preliminary Statement have the meanings given to them below.

*Affidavit*, (iii) filed the *Affidavit of Inventory*, and (iv) served notice of the ABC Proceeding on all creditors together with a claim form.  The Assignee is now reviewing and analyzing returned claim forms.   But for this Involuntary Proceeding, the Assignee is prepared to file the necessary paperwork to seek approval of appraisers, post bond, have the CTG Assignment Estate appraised, and otherwise continue forward toward an efficient and complete administration of the CTG Assignment Estate.

2.      Thus, there is very little to do to complete winding down the Alleged Debtor's business other than to analyze claim forms, investigate potential claims and causes of action that may merit prosecution, make distributions to creditors, and file the final tax returns.  Subject to the results of its analysis of the merits of any potential claims and causes of action, the Assignee believes the distribution process and the ABC Proceeding could be complete within a few months.

3.      ***The Petitioning Creditors knew the Alleged Debtor was liquidating its assets in May 2025 and that the Alleged Debtor may elect to enter an ABC proceeding to complete the wind-down process***.   The Petitioning Creditors said nothing until August 15, 2025, 92 days after filing an amendment to a UCC-1 filed by one of the Petitioning Creditors, to send a draft involuntary petition together with a demand for return of an unduly burdensome document within an unreasonable amount of time.   On August 21, 2025, the Assignee served the Petitioning Creditors with a copy of the ABC Petition and, later that same day, spoke with the Petitioning Creditors via telephone.  Thereafter, the Petitioning Creditors *still* said nothing and took no action concerning the ABC Proceeding until they commenced the above-captioned involuntary proceeding (this "**Involuntary Proceeding**") on September 5, 2025.  Then, for some unknown and undiscernible reason, and despite previous direct email and telephone contact with the Assignee (through counsel) and an "all-hands" call on August 21, 2025, the Petitioning Creditors

served the Involuntary Petition and a summons by mail upon the Alleged Debtor and the Assignee. They didn't call.  They didn't email.  They didn't file a notice in the ABC Proceeding.  They didn't instruct their counsel to take a short walk over to the Assignee's counsel's office.  As a result, the Alleged Debtor and the Assignee did not receive the Involuntary Petition and summons until September 17, 2025.

4.      Involuntary Proceeding serves no purpose.  The Alleged Debtor's assets have already been liquidated; the CTG Assignment Estate consists entirely of cash, limited accounts receivable, a handful of worthless leases, and any potential claims and causes of action that merit prosecution.  The Assignee has already taken possession, custody and control of the CTG Assignment Estate, inventoried the Alleged Debtor's assets, filed the *Affidavit of Inventory* and other necessary papers in the Chancery Court, and served notice and a claim form on all creditors. Creditors are now returning claim forms.  Because the CTG Assignment Estate consists almost entirely of cash, appraisal will not be a difficult or time-consuming task.

5.      This Involuntary Proceeding should be dismissed pursuant to section 707 of the Bankruptcy Code or, in the alternative, the Court should abstain and dismiss this Involuntary Proceeding pursuant to section 305(a)(1) of the Bankruptcy Code.  No reasonable person in the Petitioning Creditors' position would have initiated this Involuntary Proceeding – because it makes no sense.  The ABC Proceeding offers a perfectly good solution to achieve an equitable distribution of the CTG Assignment Estate.  A chapter 7 bankruptcy case would be inefficient and needlessly multiply costs.  The Chancery Court is perfectly capable of protecting the interests of the Alleged Debtor's creditors and presiding over any related litigation that may merit prosecution.  Federal proceedings are not necessary.

# BACKGROUND

## A.    The Alleged Debtor

6.    The Alleged Debtor is a Delaware limited liability company.  A copy of the *Limited Liability Company Agreement of CT Gardens, LLC*, made effective August 16, 2016, is attached as **Exhibit B**.

## B.    The Assignee

**7.**    The Assignee is a Florida limited liability company located at P.O. Box 690873, Vero Beach, FL, 32969.  The Assignee is a management consulting firm providing financial advisory, interim leadership, performance improvement and crisis/turnaround management services to companies in transition.  The Assignee was founded by Gregg F. Stewart in 2006. Since founding the Assignee, Mr. Stewart has performed numerous engagements that include interim leadership, crisis and turnaround management, operational and financial restructurings, strategic and financial advisory, operational assessments and performance improvement.  The Assignee has extensive experience in out-of-court liquidations, dissolutions, receiverships, and assignments for the benefit of creditors.

8.    The Assignee also has extensive experience with the Alleged Debtor's former operations, financial structure and creditors.   From January 30, 2020, to April 12, 2020, Assignee, through Mr. Stewart, was engaged by the Alleged Debtor to serve as its Interim Chief Executive Officer ("**CEO**").  As Interim CEO, Mr. Stewart was charged with assessing management across all divisions, assisting in hiring and transitioning to a new permanent CEO, improving financial results, managing trade relationships, evaluating systems and overseeing the Alleged Debtor's efforts to drive new customer growth.  At the end of his 3 ½ month engagement, Mr. Stewart transitioned his role to a new permanent CEO and separated from the Alleged Debtor.

9.      From May 12, 2025, until July 1, 2025, Assignee, again through Mr. Stewart, served as an outside financial advisor to the Alleged Debtor.  In the midst of the flurry of activity described below, Mr. Stewart spent the majority of his time communicating with suppliers and landlords.

10.     The Assignee is not a creditor, an equity security holder or an insider of the Alleged Debtor.

11.     The Assignee is not and was not, within 2 years before the date of filing the ABC Petition, a director, officer, or employee of the Alleged Debtor.

12.     The Assignee does not have an interest materially adverse to the interest of the CTG Assignment Estate or any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in the Alleged Debtor or for any other reason.

**C.      The General Assignment**

13.     Pursuant to the Assignment, the Alleged Debtor and its parent, CT Gardens Holdings, LLC ("HoldCo" and, together with the Alleged Debtor, the "**Assignors**")[2] assigned, granted, conveyed, transferred and set over to the Assignee, "in trust, for the benefit of [the Assignors'] creditors generally, except as expressly set forth [in the Assignment], all of [the Assignors'] right, title, and interest in all real or personal property and all other assets, whatsoever and where so ever situated . . . ."  Assignment § 2(a).

14.     Under section 3 of the Assignment, the Assignee is assigned all "powers necessary to marshal and liquidate the CTG Assignment Estate, including but not limited to:  . . . **(g)** to settle any and all claims against or in favor of the Assignor, with the full power to compromise, or, in the Assignee's sole discretion, to sue or be sued, and to prosecute or defend any claim or claims

---

[2]      HoldCo owns 100% of all issued and outstanding membership interests of the Alleged Debtor.

of any nature whatsoever existing in favor of the Assignor;. . . **(n)** to exercise all powers, rights, responsibilities, and duties as holder of equity, partner, member, or otherwise, with respect to any and all direct and indirect subsidiaries of the [Assignors], . . . [and] **(o)** to do and perform any and all other acts necessary and proper for the liquidation or other disposition of the assets, including but not limited to abandonment, and the distribution of the proceeds derived therefrom to Assignor's creditors."  Assignment §§ 3(g), (n), and (o).

> **D.**    **The ABC Proceeding is the Culmination of a Wind-Down Strategy First Implemented in May 2025.**

15.    The Alleged Debtor is indebted to creditors and has not operated as a going concern since April 2025.   As described below, the Alleged Debtor decided earlier this year to liquidate its assets and pay its debts, so far as possible, through an assignment for the benefit of creditors proceeding (the "**ABC Proceeding**"), under the process afforded under 10 Del. C. §§ 7381-7387. The Alleged Debtor then solicited the assistance of the Assignee to administer the CTG Assignment Estate through the ABC Proceeding.

> **E.**    **Events Leading to the Assignment**

16.    The Alleged Debtor, formerly known as myAgway, Dave's Soda, and Pet City, was a pet supply and garden center.  The Alleged Debtor's business was seasonal, with the bulk of its revenues coming during the period from spring to mid-summer.  The Alleged Debtor operated in that capacity for approximately thirty-five years. In 2016, Alleged Debtor's business was acquired by an affiliate of CapitalSouth Partners Funds ("**CSP**") through an infusion of equity capital and by CSP's affiliate providing $8 million of secured debt (with an additional secured loan of $2.4 million and a $1.4 million preferred equity investment).

17.    The Alleged Debtor operated its business under CSP's ownership until September 2024, when the Alleged Debtor's former senior secured lender, Bank of America ("**BofA**"),

determined that it would no longer provide operating capital for the Alleged Debtor and required the Alleged Debtor to repay the outstanding balance of BofA's loans immediately. Without additional funding to bridge the Alleged Debtor's liquidity needs, it determined that it would be unable to continue operating as going concern by the end of 2025 absent a sale transaction or other infusion of liquidity.

18.    Considering BofA's decision, the Alleged Debtor, with CSP's support, commenced a sale process for its business and assets, while still negotiating with BofA for a potential forbearance. Despite engaging in extensive negotiations with BofA, which continued into 2025, the parties were unable to finalize a forbearance agreement.

19.    The Alleged Debtor engaged Osage Advisors ("**Osage**") as an investment banker to market Alleged Debtor's businesses and assets.  Initial sale efforts beginning in October 2024 consisted of marketing to over 3,000 parties and executed NDAs with 55 parties (including 9 strategic acquirers), resulted in four indications of interest by December 2024.  However, the Alleged Debtor's financial performance deteriorated in 2024 due to market pressures and a lack of operating capital.  When potential bidders were provided with updated financial information, two bidders withdrew from the process, and the other two provided revised, and significantly reduced, offers, none of which were sufficient to pay BofA's debt in full.  Despite the setback, the Alleged Debtor and Osage continued to market the Alleged Debtor's business and assets and to negotiate with interested potential buyers.

20.    By March 2025, it became clear that there would not be any other bidders for Assignor's business and assets.  Assignors and Osage negotiated to improve the existing bids and ultimately brought the only bid to BofA for its approval.  BofA did not accept the bid. While

beginning to explore other options, the Assignor continued to work both with BofA as well as the only bidder to see if an alternative deal could be reached.

21.     With no viable sale option, the Alleged Debtor was likely to lose its busiest season and miss the window to maximize the value of its assets.  To avoid significant diminution in the value of the Alleged Debtor's assets, the Alleged Debtor and CSP investigated the orderly winddown of the Alleged Debtor's business.  CSP and the Alleged Debtor entered into discussions with Hilco Merchant Resources LLC ("**Hilco**") concerning a potential orderly liquidation and winddown of the Alleged Debtor's business.

22.     Before committing to a winddown, the Alleged Debtor and CSP engaged BofA one last time, with an improved bid from one of the proposed buyers.  After weeks of negotiations, BofA agreed to accept a 45.5% discounted payoff on the then-outstanding balance of $3,949,999.00, conditioned on BofA's receipt of funds within one week of the date of agreement, *i.e.*, on or before May 1, 2025 (the "**BofA Deadline**"). Having secured BofA's agreement, the Alleged Debtor and CSP worked with the potential buyer to negotiate and finalize the terms of the sale. After negotiation, the prospective buyer committed that it would meet the terms required by BofA to consummate a transaction and both parties dedicated 100% of their time and effort to closing a transaction for a going concern sale.  Unfortunately, despite all parties' best efforts to finalize the transaction, just before the BofA Deadline, the prospective buyer determined not to move forward with the transaction.

23.     The Alleged Debtor was left without a buyer.  Having exhausted all options to continue its business as a going concern, and with BofA's agreement to take a steeply discounted payoff set to expire, the Alleged Debtor re-engaged with Hilco.  On May 1, 2025, the Alleged Debtor and Hilco agreed to terms and began the process of winding down the Alleged Debtor's

business.  Within days, Hilco began conducting going out of business sales (the "**Liquidation Sales**") of the Alleged Debtor's remaining inventory and assets at all of its locations, to recoup as much value as possible for the benefit of the Alleged Debtor's creditors.

24.    The Liquidation Sales, which concluded on June 30, 2025, ultimately brought in approximately over $4.5 million of value to the Alleged Debtor.  In addition, the Alleged Debtor retained approximately over $1.5 million of cash on its balance sheet as of the commencement of the Liquidation Sales.  After paying off BofA's debt, making payroll, and remitting other necessary payments in preparation for the ABC Proceeding, all other proceeds of the Liquidation Sales remain in the Alleged Debtor's possession and were transferred to the Assignee under the Assignment.

25.    The Assignors entered into the General Assignment on August 20, 2025, with the full support and consent of CSP, who has agreed to allow the Assignee to use its cash collateral for the maintenance and operation of this action.

### F.    The Assignment Proceeding

26.    As noted above, on August 20, 2025, the Assignee commenced the ABC Proceeding in the Chancery Court, *In re CT Gardens Holdings, LLC and CT Gardens, LLC*, Case No. 2025-0940-CDW.  A copy of the *Verified Petition for Assignment for the Benefit of Creditors* is attached as **Exhibit C**.

27.    On September 2, 2025, the Chancery Court issued the *Order Governing the Assignment for the Benefit of Creditors* (the "**Governing Order**").  A copy of the Governing Order is attached as **Exhibit D**.

28.     On September 15, 2025, in accordance with the Governing Order, the Assignee filed the *Initial Affidavit of Assignee*.  A copy of the *Initial Affidavit of Assignee* is attached as **Exhibit E**.

29.     Also on September 15, 2025, in accordance with the Governing Order and 10 *Del. C.* § 7381, the Assignee filed the *Affidavit of Inventory*.  A copy of the Inventory Affidavit is attached as **Exhibit F**.  The Assignee's liquidation value of the Alleged Debtor's assets as of the date of the Assignment total $3,598,842, which consists of cash in the amount of $3,560,425 and accounts receivable valued at $38,417.  *See* Exhibit F at Schedule of Assets.  Claims against the CTG Assignment Estate consist of (i) secured claims totaling $12,414,328, and (ii) unsecured claims totaling approximately $5,818,942.12.  In addition, the Assignee estimates potential exposure under the Alleged Debtor's worthless leases to be approximately $1.4 million.  *See* Exhibit F at Secured Creditors, Unsecured Creditors and Lessors.

30.     On September 16, 2025, the Assignee instructed *Parcels* to serve to all creditors (i) the *Notice of (I) Assignment for the Benefit of Creditors; (II) Entry of Order Governing the Assignment for the Benefit of Creditors; (III) Filing of Inventory; and (IV) Deadline to Submit Claims* (the "**ABC Notice**") and (ii) a blank *Claim Form*.  A copy of the ABC Notice is attached as **Exhibit G**.  A copy of the Claim Form is attached as **Exhibit H**.  A copy of the *Affidavit of Service* of Rafael Collazo of Parcels is attached as **Exhibit I.**  As stated in the *Affidavit of Service*, the Assignee caused the ABC Notice and Claim Form to be mailed (i) via First Class United States Mail to 282 creditors and (ii) via International Mail to 2 creditors.  *See* Exhibit I.

31.     The Assignee learned of this Involuntary Proceeding on September 17, 2025.

32.     The Assignee is prepared to file a motion seeking the appointment of appraisers pursuant to 10 *Del. C.* § 7382 including all information pursuant to the Governing Order.  The

Assignee is reviewing and analyzing returned Claim Forms and will continue to do so subject to any relief that may be entered with respect to the Involuntary Petition, if any.

### G.    <u>The Petitioning Creditors</u>

33.     The Petitioning Creditors were aware – in May 2025 – that the Alleged Debtor was going out of business and liquidating its assets.  In addition, at least two of the Petitioning Creditors had direct communications where they were informed that, among other options to wind-down the Alleged Debtor, the board may elect to complete the wind-down process pursuant to assignment for the benefit of creditors.

34.     The CEO of the Alleged Debtor and Hilco were in direct contact with Arett on and after May 6, 2025.

35.     Through Mr. Stewart, then working as an outside financial advisor, the Alleged Debtor was in direct telephone contact with Bradley Caldwell on May 23, 2025 and Arett on June 10, 2025.

36.     Upon information and belief, BFG was also well aware of the Alleged Debtor's liquidation sales and plan to wind-down its business because on May 8, 2025, BFG filed a UCC-1 financing statement (the "**BFG Original UCC-1**") purportedly under authority of a credit application executed on August 8, 2021.[3]  Then on May 15, 2025, BFG filed an amendment to the BFG Financing Statement (the "**BFG UCC-1 Amendment**").

37.     The Petitioning Creditors then waited until August 15, 2025, the 92nd *day* after the date of the BFG UCC-1 Amendment (also the 99th day after the date of the BFG Original UCC-1)

---

[3]     The date of the credit application states that it was signed on February 8, 2021, but the accompanying *Terms and Conditions* are dated February 8, 2022.  In addition, the file containing information concerning BFG's UCC filings was named "2022-02-08 BFG CTG Dealer App".  In an abundance of caution, the Assignee above states the date that is handwritten next to the signature on the credit application that includes the language quoted in the BFG Financing Statement.

to utter their first word concerning the Alleged Debtor's financial condition.  *See* 11 U.S.C. § 547(b)(4)(A).    On that date, the Petitioning Creditors, threatened to file an involuntary petition by sending the Alleged Debtor a letter with an enclosed draft unsigned involuntary petition and an overly burdensome document request stating an unreasonable return date.  Clearly, the Petitioning Creditors were threatening an involuntary petition in hopes of exacting a settlement from the Alleged Debtor.

38.    On August 21, 2025, the Assignee's counsel delivered a copy of the ABC Petition to the Petitioning Creditor' counsel via email.  Later that same day, the Assignee spoke with the Petitioning Creditors via telephone, together with each of their counsel.

39.    The Petitioning Creditors then waited another 15 days before filing the Involuntary Petition on September 5, 2025.

40.    The Petitioning Creditors then waited another 4 days before they dropped the Involuntary Petition in the regular mail on September 9, 2025.  *Again*:  despite  (i) direct contact with the Alleged Debtor in May concerning the Alleged Debtor's cessation of operations, plans to liquidate its assets and the possibility of an ABC Proceeding to complete the Alleged Debtor's wind-down, (ii) knowledge of the Liquidation Sales, (iii) receipt of an emailed copy of the ABC Petition on August 21, 2025, and (iv) an "all hands" telephone call later that same day – the Petitioning Creditors waited until ***September 5, 2025*** to file the Involuntary Petition and then, 4 days later,  simply dropped the Involuntary Petition and a summons in the mail.

41.    On September 17, 2025, the Assignee and the Assignee's counsel received the Involuntary Petition.

## LEGAL ARGUMENT

### A.   The Assignee Has Standing to Contest the Involuntary Petition.

42.   The Assignee has standing to contest the Involuntary Petition.  *HH Technology Corp.*, 659 B.R. 788, 801 (1st Cir. BAP 2024) ("The Bankruptcy Code and the Bankruptcy Rules specifically permit an alleged debtor to contest an involuntary petition. See 11 U.S.C. § 303(d); Fed. R. Bankr. P. 1011(a). When the alleged debtor has not contested the petition, however, courts have permitted assignees to do so. *See, e.g., A & B Liquidating, Inc.*, 18 B.R. 922, 925 (Bankr. E.D. Va. 1982).)  Even where "the alleged debtor joined the assignee's motion to dismiss, one bankruptcy court held that the assignee was "deemed" to have the debtor's standing." *Id.* (citing *In re Kenval Mktg. Corp.*, 38 B.R. 241, 242-43 (Bankr. E.D. Pa. 1984)).

43.   Pursuant to the Assignment, the Alleged Debtor transferred and assigned to the Assignee all its assets for the Assignee to liquidate and distribute to the Alleged Debtor's creditors. In *HH Technology*, the court found this fact, alone, sufficient to find that the Assignee had standing to contest an involuntary petition.  *In re HH Technology Corp.*, 659 B.R. at 794 and 801.  In addition to the assignment of the Alleged Debtor's assets, here, the Assignment expressly gives to the Assignee the power to defend against the Involuntary Petition and otherwise defend claims against the Alleged Debtor.  *See* Assignment at §§ 3(g), (n), and (o).

### B.   The Court Should Abstain Pursuant to 11 U.S.C. § 305(a)(1).

44.   The Court should abstain from hearing the Involuntary Petition and dismiss this Involuntary Proceeding.  No bankruptcy purpose would be served by entering an order for relief.

45.   Section 305(a)(1) of the Bankruptcy Code provides that a court may dismiss or suspend a bankruptcy case if "the interests of creditors and the debtor would be better served" by doing so. 11 U.S.C. § 305(a)(1). Additionally, "a district court shall abstain from hearing a

proceeding based upon a State law claim if an action is commenced and can be timely adjudicated in a State forum of appropriate jurisdiction." *In re Barone*, 96 F.3d 1444 (5th Cir. 1996) (citing 28 U.S.C. § 1334(c)(2)) (explaining three bases for abstention).  Although characterized as an "extraordinary remedy", the facts surrounding this Involuntary Proceeding dictate that, abstention will serve the interests of the Alleged Debtor and its creditors.

46.    Case law has set forth a litany of factors to be considered by the court to gauge the overall best interests of the creditors and the debtor for section 305(a)(1) purposes:

(1) the economy and efficiency of administration;

(2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

(3) whether federal proceedings are necessary to reach a just and equitable solution;

(4) whether there is an alternative means of achieving an equitable distribution of assets;

(5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

(6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

(7) the purpose for which bankruptcy jurisdiction has been sought.

While all factors are considered, not all are given equal weight in every case and the court should not conduct a strict balancing.

*In re Acis Cap. Mgmt., L.P.*, 584 B.R. 115, 145–46 (Bankr. N.D. Tex. 2018) (emphasis in original); *In re Pure Prairie Poultry, Inc*., 2025 WL 419414, at *5; *In re NRG Energy, Inc.,* 294 B.R. 71, 80 (Bankr. D. Minn. 2003) (citing *In re Fax Station, Inc.,* 118 B.R. 176, 177 (Bankr. D. R.I. 1990); *In re 801 South Wells St. L.P.,* 192 B.R. 718, 723 (Bankr. N.D. Ill. 1996); *In re Trina Assoc*., 128 B.R. 858, 867 (Bankr. E.D. N.Y. 1991)).

47.     "Courts have placed great emphasis in invoking 11 U.S.C. § 305(a) on the economy of administration of a case, the need for additional administrative expenses, and the duplication of effort," while others have found abstention appropriate where "a non-federal insolvency proceeding [has] progressed so far as to make a bankruptcy duplicative and costly," and that abstention is particularly appropriate in involuntary cases. *In re Iowa Tr*., 135 B.R. 615, 621–22 (Bankr. N.D. Iowa 1992) (internal citations omitted). Another court looked at three factors: "(1) the petition was filed by a few recalcitrant creditors and most creditors oppose bankruptcy; (2) a state insolvency proceeding or out of court arrangement is pending; [and] (3) dismissal is in the best interest of the debtor and creditors." *In re Rai Marketing Services, Inc.*, 20 B.R. 943, 6 C.B.C.2d 995 (Bkrtcy.D.Kan.1982). Numerous forms of non-bankruptcy proceedings have been sufficient to invoke abstention.  *See In re Bailey's Beauticians Supply Company*, 671 F.2d 1063 (7th Cir.1982) (state court receivership), *In re Sun World Broadcasters*, 5 B.R. 719 (Bkrtcy.M.D.Fla.1980) (SEC equity receivership), *In re Starbuck*, 14 B.R. 134 (Bkrtcy.S.D.N.Y.1981) (bulk sale agreement). *In re Bioline Laboratories*, 9 B.R. 1013 (Bkrtcy.E.D.N.Y.1981); *In re Iowa Tr.*, 135 B.R. at 621-22 (citing *In re M. Egan Co., Inc.,* 24 B.R. 189, 191 (Bankr.W.D.N.Y.1982)).

48.     "'[C]ourts generally dismiss an involuntary case under § 305(a)(1) where the debtor has made an assignment for the benefit of creditors.'"  *In re Pure Prairie Poultry, Inc.*, 2025 WL 419414, *5 (Bankr. N.D. Iowa Feb. 5, 2025) (citing *In re Cincinnati Gear Co.,* 304 B.R. 784, 785–86 (Bankr. S.D. Ohio 2003) (citing *In re Bailey's Beauticians Supply Co.,* 671 F.2d 1063); *In re Artists' Outlet, Inc.*, 25 B.R. 231 (Bankr. D. Mass. 1982); *In re M. Egan Co., Inc.*, 24 B.R. 189 (Bankr. W.D. N.Y. 1982)); and Mike C. Buckley & Gregory Sterling, *What Banks Need to Know About ABCs*, 120 Banking L.J. 48, 54 (2003) ("Reluctant creditors will find it difficult to attack an

[ABC]. Creditors who file an involuntary bankruptcy case after the ABC will usually be faced with a motion by the Assignee or other interested parties to dismiss or abstain from the bankruptcy case on the grounds that the pending ABC is a more than adequate substitute for an involuntary bankruptcy case. Replacing one professional fiduciary with another would generally be a waste of resources and time, and most such involuntary bankruptcies are dismissed, or the bankruptcy court abstains in deference to the existing ABC.").

49.     As also noted by the *Pure Prairie* court, the legislative history of section 305 of the Bankruptcy Code shows that Congress considered abstention under similar circumstances. *See Pure Prairie*, 2025 WL 419414, at *5 (citing H.R. REP. NO. 95-595, 95th Cong. 1st Sess. 325 (1977); S.R. REP. NO. 95-989, 95th Cong. 2d Sess. 36 (1978) ("[I]f an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case.")).

50.     Consistent with the factors stated above, the present case is precisely the kind of case in which courts abstain:

a.     *First*, a chapter 7 case would be uneconomic and inefficient in light of the ABC Proceeding and the work that has already been done since May 2025, and the time it would take to administer a chapter 7 case.  The Alleged Debtor's assets have already been liquidated except for a handful of worthless assets, a small amount of accounts receivable and potential claims and causes of action which, to the extent any such claims and causes of action exist, may not merit prosecution after investigation.

b.      **Second**, the ABC Proceeding is already underway in the Chancery Court and offers a perfectly competent and efficient forum to protect the interests of all of the Alleged Debtor's creditors.   The Assignee has already negotiated and executed the Assignment, commenced the ABC Proceeding by filing the ABC Petition, filed the *Initial Affidavit* in the form stated by the Chancery Court in the Governing Order, inventoried the CTG Assignment Estate's assets and filed the Inventory Affidavit, served the ABC Notice and a Claim Form on all of the Alleged Debtor's 284 creditors, and is now reviewing and analyzing Claim Forms returned by creditors.

c.      **Third**, federal proceedings are not necessary to reach a just and equitable solution because, as stated above, the Chancery Court is more than capable of governing the fair and just distribution of the assets of the CTG Assignment Estate – which, again, already consists almost entirely of the cash proceeds of the Liquidation Sales conducted in May 2025.  If any claims or causes of action merit prosecution, the Chancery Court is also more than capable of handling such litigation.  Further, there is a significant likelihood that any such claims or causes of action would be non-core proceedings if filed as adversary proceedings in a chapter 7 case.

d.      **Fourth**, as stated above, the ABC Proceeding in Chancery Court, already well underway, is a perfectly suitable alternative of achieving an equitable distribution of the assets of the CTG Assignment Estate.

e.      **Fifth**, the ABC Proceeding will also be significantly less expensive than a chapter 7 case because, with respect and affinity for Delaware's panel chapter 7 trustees, it must be noted that a chapter 7 trustee would receive a base administrative fee, plus a commission of at least approximately $128,500 upon being handed the approximate $3.5 million in proceeds from the Liquidation Sales, *see* 11 U.S.C. § 326(a), plus attorneys' fees and costs to the chapter 7

trustee's counsel, plus other costs and expenses of administration.  The chapter 7 trustee would then have virtually nothing to do other than go over the Assignee's work, take another look at any potential claims or causes of action that may exist and merit prosecution, review and analyze proofs of claim and make distributions.  The ABC Proceeding, on the other hand, is being conducted on the Assignee's hourly rate of $500/hr together, a very limited budget for counsel, the cost of appraisers, bond, tax return preparation, and some small out-of-pocket expenses such as an outside third-party document services company (Parcels) for mailings.

f.      ***Sixth***, for the reasons already stated above, the ABC Proceeding has proceeded so far that it would be needlessly costly and time-consuming to start afresh with a chapter 7 case.

g.      ***Seventh,*** the Petitioning Creditors could not have invoked federal bankruptcy jurisdiction for any good or reasonable purpose – and it certainly was not with the best interests of all of the Alleged Debtor's creditors in mind.  Proper reasons to file an involuntary petition include petitioning creditors' "desire to protect themselves against other creditors obtaining a disproportionate share of [the alleged debtor's] assets" and "a desire to prevent dissipation of [the alleged debtor's] assets before [the alleged debtor's] funding ran out." *In re General Aeronautics Corp.*, 595 B.R. 442, 479 (Bankr. D. Utah 2018) (citing *Gen. Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1502 (11th Cir. 1997 and *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 336 (3d Cir. 2015).  ***If the Petitioning Creditors actually thought that they were under threat of a disproportionate distribution or dissipation of assets,*** the Petitioning Creditors would have kicked into action in May 2025, when they learned that the Alleged Debtor was liquidating all of its assets – in other words, converting all of its assets to cash. Instead, one of them filed an objectionable UCC-1 financing statement based on a years-old credit

application and with actual knowledge that the Alleged Debtor was insolvent.  Then all of the

Petitioning Creditors waited until the end of the relevant 90-day preference period.  Then they used

the prospect of an involuntary petition as nothing more than a threat for their own selfish benefit.

And then, even after receiving an emailed copy of the ABC Petition, they waited another 15 days

before filing the Involuntary Petition and an addition 4 day before simply dropping the Involuntary

Petition in the mail to the Alleged Debtor and the Assignee.  They did nothing else to let anyone

know they filed the Involuntary Petition.  And they never appeared in the ABC Proceeding.  These

are not the acts of creditors who are concerned about dissipation of assets or a disproportionate

distribution.  Creditors filing an involuntary petition for proper purposes would have acted

*immediately*.  There was no good or reasonable purpose for the Petitioning Creditors to commence

this Involuntary Proceeding.

### C.    The Involuntary Petition Should Be Dismissed Pursuant to 11 U.S.C. § 707(a).

51.    An involuntary petition is an extreme remedy with serious consequences.  *In re

Forever Green Ath. Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015); *In re Apollo Health Street, Inc.*,

2011 WL 1884182, at *5 (Bankr. D.N.J. May 18, 2011).

52.    An involuntary petition may be dismissed "for cause" after "notice and a hearing."

11 U.S.C. § 707(a); *In re MacFarlane Webster Assocs.*, 121 B.R. 694, 696 (Bankr. S.D.N.Y. 1990)

("The wording of the statute indicates that it covers both voluntary and involuntary cases.").  A

chapter 7 case may be dismissed "for lack of good faith" and whether to dismiss a case on such

grounds "rests within the sound discretion of the bankruptcy court."  *Tamecki v. Frank* (*In re

Tamecki*), 229 F.2d 205, 207 (3d Cir. 2000).  Whether to dismiss a bankruptcy petition "is a fact-

sensitive assessment left to the discretion of the Bankruptcy Court, which makes this determination

on a case-by-case basis in light of the totality of the circumstances."  *In re Gretz*, 2011 WL

1048635, *2 (Bankr. D. Del. Mar. 18, 2011); *see also In re Sky Group Int'l, Inc.*, 108 B.R. 86, 90

(Bankr. W.D. Pa. 1989).

53.     The Court may consider such factors as whether the petitioning creditors have

"abused the provisions, purpose, or spirit of the bankruptcy law." *Id.* (citing *In re Marks*, 174 B.R.

37, 40 (E.D. Pa. 1994)).  Courts "must consider whether a reasonable person in the position of the

petitioning creditor would have initiated the bankruptcy proceeding" and ascertain "the subjective

motivations of a petitioning creditor." *In re Elsub Corp.*, 66 B.R. 189, 193 (Bankr. D.N.J. 1986).

In a motion to dismiss involving an involuntary petition, the burden is on the petitioning creditors

to show good faith:

> Once a party calls into question a petitioner's good faith, the burden shifts to the
> petitioner to prove, his good faith." [*Tamecki*, 229 F.3d at 207]  (citing *In re Marks*,
> 174 B.R. at 40). The Third Circuit has also stated that "Bankruptcy Courts may
> reasonably find that bad faith exists 'where the purpose of the bankruptcy filing is
> to defeat state court litigation without a reorganization purpose.'" *In re Myers*, 491
> F.3d 120, 125 (3.d Cir.2007) (citing *In re Dami*, 172 B.R. 6, 10
> (Bankr.E.D.Pa.1994)); see also *In re Huckfeldt*, 39 F.3d 829, 832 (8th Cir.1994)
> (finding that a chapter 7 bankruptcy case was filed in bad faith and was properly
> dismissed for cause where the debtor's purpose was to frustrate another court's
> jurisdiction).

*In re Crest By The Sea, LLC*, 522 B.R. 540, 547 (Bankr. D.N.J. 2014).  "[S]uspicious timing of a

bankruptcy petition is an appropriate factor for a court to consider in the bad faith analysis." *In re*

*Meyers*, 491 F.3d at 125 (citing *Tamecki*, 229 F.3d at 208).

54.     Common sense dictates that the Petitioning Creditors did not consider the best

interests of the Alleged Debtor's creditors when they filed the Involuntary Petition.  The

Petitioning Creditors have known since May that the Alleged Debtor was going out of business,

liquidating its assets and that, among other options to wind-down the Alleged Debor, the board

may elect to complete the wind-down process pursuant to assignment for the benefit of creditors.

The Petitioning Creditors stood by and watched the Liquidation Sales without saying a word.  Then

the Petitioning Creditors *still* took no action for 15 days after they received a copy of the ABC

Petition.  Instead, the Petitioning Creditors tacitly watched and waited while the preference period

related to BFG's UCC-1 filings ran.  During that period, however, the Alleged Debtor

consummated the Liquidation Sales, negotiated and drafted the Assignment, prepared and filed the

papers necessary to commence the ABC Proceeding, complied with the Governing Order, took

possession, custody and control of the CTG Assignment Estate, and prepared and filed the

Inventory Affidavit.  Then, because the Petitioning Creditors (oddly) served the Involuntary

Petition via mail without any other notice whatsoever, the Assignee served the ABC Notice on 284

creditors together with the Claim Form.  And now, creditors are returning Claim Forms.

55.     The Petitioning Creditors did not enter an appearance in the ABC Proceeding.

Instead, they recklessly filed the Involuntary Petition, thereby interrupting the momentum that the

Assignee has established for the benefit of the Alleged Debtor's creditors.  The Assignee has made

significant strides in the administration of the CTG Assignment Estate.  Given the substantial

progress made to date, this Involuntary Proceeding would be a waste of time and resources and

would only serve to confuse creditors and multiply costs.

56.     Moreover, the Alleged Debtor has no assets to liquidate.  Virtually the entire CTG

Assignment Estate consists of cash, limited accounts receivable, a handful of worthless leases, and

any potential claims and causes of action that merit prosecution.  The Petitioning Creditors did not

file the Involuntary Petition in good faith.

**D.     The Assignee is Entitled to Reasonable Costs and Attorneys' Fees, and Sanctions Should be Imposed Against the Petitioning Creditors.**

57.     As the Involuntary Petition is subject to dismissal pursuant to either section

305(a)(1) and/or 707(a) of the Bankruptcy Code, the Court may, and in this situation, should,

award reasonable costs and attorneys' fees and impose sanctions against the Petitioning Creditors

pursuant to sections 303(i) of the Bankruptcy Code.  That section provides that, in the event the court dismisses an involuntary petition, the alleged debtor, and in this case, the CTG Assignment Estate, is entitled to the recovery of costs incurred in defending against the Petitioning Creditors. See 11 U.S.C. §303(i)(1). Additionally, courts may grant compensatory and punitive damages against any petitioner that filed the involuntary petition in bad faith. See 11 U.S.C. §303(i)(2).

58.     Even though imposition of fees and costs is discretionary, the majority rule typically awards fees and costs upon dismissal. In re Silverman, 230 B.R. 46 (Bankr. D.N.J. 1998). Additionally, the imposition of costs and attorneys' fees need not be accompanied by a finding of bad faith. *In re Landmark Distributors, Inc.*, 189 B.R. 290, 306 (Bankr. D.N.J. 1995).

59.     Here, the Assignee is entitled to and should be awarded its reasonable costs and expenses, including the fees and costs of its attorneys.  This Involuntary Proceeding will serve no purpose other than to deplete assets of the CTG Assignment Estate that would be much better used to make distributions to creditors.

**WHEREFORE,** for all of the foregoing reasons, the Assignee respectfully requests that the Court enter an order (i) abstaining from hearing the Involuntary Petition and dismissing this Involuntary Proceeding pursuant to section 305(a)(1) of the Bankruptcy Code or, in the alternative, dismissing the Involuntary Petition pursuant to section 707(a) of the Bankruptcy Code; (ii) awarding to the Assignee its reasonable costs and expenses, including the fees and costs of its attorneys; and (iii) granting to the Assignee such other and further relief as is appropriate.

`

**RAINES FELDMAN LITTRELL, LLP**

Dated:  October 3, 2025

By:  /s/ *Mark W. Eckard*
Thomas J. Francella, Jr. (3835)
Mark W. Eckard (4542)
824 N. Market Street, Suite 805
Wilmington, DE  19801
(302) 778-5803
TFrancella@RainesLaw.com
MEckard@RainesLaw.com

*Counsel to the Assignee*

10630436.3